## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MARCELLIN MUKOLO BASENGEZI,**

    **Plaintiff,**

       **v.**

**BRADLEY T. SMITH,** *et al.*,

    **Defendants.**

**Civil Action No. 23-1249 (JEB)**

---

## MEMORANDUM OPINION

The United States believes that Plaintiff Marcellin Mukolo Basengezi was involved in efforts to undermine the Democratic Republic of the Congo's national elections. Defendant Office of Foreign Assets Control thus placed him on its Special Designated Nationals and Blocked Persons List in 2019. Displeased with that designation, Plaintiff filed a delisting petition two years later, asking to be removed. He argued that he never should have been on the list to begin with and, in any event, that there had been a change in circumstances since he was added that negated the initial basis for his designation. OFAC denied the petition.

In this suit against OFAC and its Director, Bradley T. Smith, Basengezi challenges both the agency's decision to deny his delisting petition and the notice that OFAC provided him of the reasons for such denial. Specifically, he contends that the Government's decision was arbitrary and capricious under the Administrative Procedure Act and that its notice was inadequate under both the APA and the Fifth Amendment's Due Process Clause. Defendants have now filed a Motion to Dismiss Plaintiff's Amended Complaint or, in the alternative, for Summary Judgment. Plaintiff opposes that Motion while filing a Cross-Motion for Summary Judgment. Having

conducted *in camera* review of the classified administrative record, the Court concludes both that OFAC's denial was not arbitrary or capricious, and that it provided Basengezi with sufficient notice.  It thus will grant the Government's Motion.

## I.      Background

### A.  Statutory Scheme

Since our nation's infancy, many of its leaders have viewed economic sanctions as "the most likely means of obtaining our objects without war."  James Madison, "Political Observations," National Archives (Apr. 20, 1795).  In 1977, amidst the Cold War, Congress passed the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, which grants the President broad discretion to impose economic sanctions on foreign entities and individuals in the event of a national emergency.  See Fulmen Co. v. OFAC, 547 F. Supp. 3d 13, 17 (D.D.C. 2020) (citing 50 U.S.C. § 1702(a)(1)(B)); see also Dames & Moore v. Regan, 453 U.S. 654, 677 (1981).  The President may declare such a national emergency "when an extraordinary threat to the United States arises that originates in substantial part in a foreign state." Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 159 (D.C. Cir. 2003).

In 2006, President Bush issued Executive Order 13413, "declar[ing] a national emergency to deal with" the threat posed by "the situation in . . . the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities" and "constitutes an unusual and extraordinary threat to the foreign policy of the United States."  E.O. 13413, 71 Fed. Reg. 64,105 (Oct. 27, 2006).  Eight years later, President Obama amended that Executive Order in light of the "continuation of activities that threaten the peace, security, or stability of the Democratic Republic of the Congo and the surrounding region, including operations by armed groups, widespread violence and atrocities, human rights abuses, recruitment and use of child

soldiers, attacks on peacekeepers, obstruction of humanitarian operations, and exploitation of natural resources to finance persons engaged in these activities."  E.O. 13671, 79 Fed. Reg. 39,949 (Jul. 8, 2014).

As amended, Executive Order 13413 authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to designate persons determined "to be responsible for or complicit in, or to have engaged in, directly or indirectly . . . actions or policies that undermine democratic processes or institutions in the Democratic Republic of the Congo" in order to "block" those persons' "property and interests in property" in the United States.  See E.O. 13413, as amended, §§ 1(a), 1(a)(ii)(C)(2); see also 31 C.F.R. § 547.201(a)(2)(iii)(B).  The Executive Order also authorizes the Secretary of the Treasury to "take such actions, including the promulgation of rules and regulations . . . as may be necessary to carry out the purposes of [E.O. 13413]."  E.O. 13413, § 5; see also E.O. 13671, § 4.  The Secretary has delegated this implementation authority to OFAC.  See 31 C.F.R. § 547.802.  When OFAC designates a person under E.O. 13413, she is added to the Specially Designated Nationals and Blocked Persons List (SDN List), and "all [her] assets in the United States or under the control of any person who is in the United States are 'blocked,' or effectively frozen."  Zevallos v. Obama, 793 F.3d 106, 110 (D.C. Cir. 2015) (cleaned up).  The regulations also prohibit U.S. people or entities from engaging in transactions with a designee.  See 31 C.F.R. § 547.201.

A designee may "seek administrative reconsideration" of her designation by filing a so-called delisting petition.  Id. § 501.807; see also id. § 547.101 (incorporating OFAC's generally applicable administrative-reconsideration procedures into regulations specifically applicable to DRC).  Such a petition may include "arguments or evidence that the person believes establishes that insufficient basis exists for the designation" or "propose remedial steps on the person's part,

such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation." <u>Id.</u> § 501.807(a); <u>see also</u> <u>Zevallos</u>, 793 F.3d at 110 (describing process).  After reviewing a delisting petition and requesting further information if necessary, <u>see</u> 31 C.F.R. § 501.807(b), OFAC "provide[s] a written decision to the blocked person." <u>Id.</u> § 501.807(d).  "If OFAC denies a request for reconsideration, the blocked person may challenge that determination under the APA" in federal court or file another administrative petition.  <u>See</u> <u>Sulemane v. Mnuchin</u>, 2019 WL 77428, at *2 (D.D.C. Jan. 2, 2019); <u>see also</u> <u>Rakhimov v. Gacki</u>, 2020 WL 1911561, at *1 (D.D.C. Apr. 20, 2020).  As the D.C. Circuit has noted, a designee may "request delisting as many times as he likes."  <u>Zevallos</u>, 793 F.3d at 110 (citing 31 C.F.R. § 501.807).

  B.  <u>Factual Background</u>

   In March 2019, OFAC announced that it had added to the SDN List three senior officials within the DRC's National Independent Electoral Commission (CENI) — which runs the country's elections — who had acted to undermine democratic processes or institutions in the DRC by "obstruct[ing] and delay[ing] preparations for credible and inclusive elections." Treasury Dep't, Press Release of Mar. 21, 2019, https://perma.cc/2Y9U-E8PB.  Those officials were CENI President Corneille Yobeluo Nangaa, Vice President Norbert Basengezi Katintima, and Plaintiff, whom the agency described as "a CENI advisor and the son of Vice President Katintima."  <u>Id.</u>

   In its press release, OFAC presented a laundry list of democracy-undermining activities that it found Basengezi had engaged in.  Specifically, it stated that he had: "embezzled and misappropriated state assets from CENI"; "undertaken actions that slowed registration"; "inflated costs for an election-related contract with the intent to use surplus funds for personal enrichment,

bribes, and campaign costs to fund the election campaign" of a particular candidate; "awarded a

separate election-related contract and doubled the award amount on the understanding that the

winning company would award the extra funds to a DRC company controlled by CENI

leadership"; and "purchased and sold gasoline for profit at the expense of CENI." Id.  Those

actions, OFAC concluded, had "delayed voter registration in Kasai, an opposition stronghold,

and meant that many voters were unable to register" for the 2018 elections.  Id.

      Seeking to understand why the agency believed that he had done each of those things,

Plaintiff asked OFAC to provide him with the administrative record underlying his designation.

When it refused, he filed suit in 2019, arguing, *inter alia*, that OFAC's failure to do so violated

the APA.  See Basengezi v. Gacki, No. 19-3414, ECF No. 1 (Compl.) (D.D.C. Nov. 12, 2019).

During the course of litigation, the Government produced a redacted version of the

administrative record.  Glad to have the record, albeit with classified and privileged information

redacted, Basengezi entered into a settlement agreement with OFAC.  See ECF No. 16-3 at 215–

21 (Settlement Agreement); see also Katintima v. Gacki, No. 19-3412, ECF No. 15 (Stipulation

of Dismissal) (D.D.C. July 22, 2020).  He agreed to dismiss his case, and the agency agreed to

adjudicate a delisting petition on a swift timeline.  See Settlement Agreement.

      In April 2021, Plaintiff filed such a petition, asking OFAC to rescind his designation and

remove his name from the SDN List.  See ECF No. 16-1 at 17–46 (Delisting Petition).  His 29-

page petition made "two separate and distinct arguments" for delisting.  Id. at 35.  First, he

asserted that there had been an insufficient basis for his designation in the first place.  Id. at 35–

41.  Second, Basengezi contended that even if there had been a sufficient basis for his

designation initially, a subsequent "change in circumstances" had "negat[ed] [that] basis" —

namely, he had left his position at CENI and the 2018 elections had occurred successfully.  Id. at

35, 41–43.  He provided more than 1,000 pages of exhibits to buttress his petition.  See ECF Nos. 11 & 12 (Pl. MSJ) at 8.

To aid its consideration of Plaintiff's submission, OFAC issued him two questionnaires seeking additional information regarding, among other things, his U.S. accounts and assets, U.S. property interests, involvement in legal proceedings, and roles and responsibilities at CENI.  See ECF No. 16-5 at 103–05 (1st Questionnaire), 128–29 (2nd Questionnaire).  The second questionnaire also sought information about his work following his departure from CENI, which could be relevant to assessing whether he was still complicit in democracy-undermining activities.  See 2nd Questionnaire.  Basengezi completed both.  See id. at 111–14 (Response to 2nd Questionnaire), 123–27 (Response to 1st Questionnaire).  His responses noted that he was "independently consulting on logistics and planning for private projects, and [wa]s also engaged in limited unpaid advisory work for the current DRC Presidency."  Response to 1st Questionnaire at 127.

OFAC also solicited the views of the U.S. Department of State's Office of Sanctions Policy and Implementation.  In a foreign-policy guidance memorandum, State recommended denying Basengezi's petition because, *inter alia*, he had "played a significant role in undermining the [DRC's] democratic processes and institutions while serving as an Advisor to DRC's [CENI]," and "a delisting would significantly undermine democratization and reform efforts in the DRC, as well as U.S. foreign policy goals."  ECF No. 16-5 at 119 (State Memorandum).

In April 2022, OFAC denied Basengezi's delisting petition.  See ECF No. 16-1 at 1–2 (Transmittal Letter).  In a letter to his counsel, the agency explained that, "[a]fter reviewing all of the unclassified and classified evidence in the record regarding [his] designation as an SDN,

including the materials [he] submitted," it had determined "that [he] ha[d] not provided credible

arguments or evidence establishing that an insufficient basis exists for the designation or that the

circumstances resulting in the designation no longer apply." Id. at 1.  With respect to his

argument that the initial designation was erroneous, OFAC responded that its "thorough review"

of the evidence "confirmed that [] Basengezi did in fact misappropriate state assets belonging to

CENI that delayed the DRC general elections, and that [] Basengezi did enrich himself through

the purchase and sale of gasoline for profit at the expense of CENI." Id. at 2.  As to his changed-

circumstances argument, the agency offered two reasons why it was unpersuaded: first, it found

that "the circumstances that led to his designation have not changed because he continues to

exert influence over democratic processes or institutions in the DRC," and second, it explained

that "he still meets the original past tense criteria for designation provided by [E.O. 13413]." Id.

In other words, the designation is still proper on the basis of his past activity on CENI even if his

recent advisory role is innocent enough.

    C.  <u>Procedural Background</u>

    Plaintiff filed this lawsuit in May 2023.  In response, the Government provided him with

the administrative record underlying its decision to deny his delisting petition, with all classified

and privileged information redacted.  <u>See</u> Am. Compl., ¶ 32.  That administrative record includes

a nine-page evidentiary memorandum summarizing the agency's evidence and conclusions

regarding his delisting petition, along with 18 exhibits.  <u>See</u> ECF No. 16-1 at 3–14 (Evidentiary

Memorandum).

    In October 2023, Plaintiff filed an Amended Complaint containing three counts.  <u>See</u>

ECF No. 9 (Am. Compl.).  Count I challenges OFAC's substantive decision to deny his delisting

petition as arbitrary and capricious in violation of the APA.  <u>Id.</u>, ¶¶ 53–62.  Count II asserts that

OFAC also violated the APA by refusing to provide Basengezi with adequate notice of the grounds for that denial.  Id., ¶¶ 63–66.  Count III alternatively contends that Defendants' failure to provide Plaintiff with sufficient notice of the reasoning behind its denial of his delisting petition also violated his due-process rights guaranteed by the Fifth Amendment.  Id., ¶¶ 67–70.

Defendants have filed a Motion to Dismiss Plaintiff's Amended Complaint or, in the alternative, for Summary Judgment, see ECF No. 10 (Def. MSJ), while Plaintiff has filed an Opposition and Cross-Motion for Summary Judgment.  See Pl. MSJ.  Having conducted an *in camera* review of the classified administrative record, the Court is now prepared to address the Motions.

## II.    Legal Standard

Although the Government moves to dismiss and, in the alternative, seeks summary judgment, the Court decides the case under the latter alone.  It thus sets out only Rule 56's requirements.  Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.

R. Civ. P. 56(c)(1).

Although styled as Cross-Motions for Summary Judgment, the submissions in this case, in part, seek the Court's review of an administrative decision.  The standard set forth in Rule 56(c), therefore, does not apply to the APA counts because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F.Supp.2d 76, 89–90 (D.D.C. 2006).  "[W]hen a party seeks review of agency action under the APA, . . . the district judge sits as an appellate tribunal."  Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (quotation marks and citation omitted).  The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## III.   Analysis

The Government defends its decision to deny Basengezi's delisting petition and also asserts that, notwithstanding its provision of a heavily redacted administrative record, it gave Plaintiff sufficient notice of the reasons undergirding that decision.  The Court will begin with an analysis of the substantive decision before turning to the adequacy of OFAC's notice.

### A.   Substantive Challenge (Count I)

Basengezi alleges in Count I that Defendants' decision to deny his delisting petition was arbitrary and capricious in violation of the APA.  See Am. Compl., ¶¶ 53–62.  The Court must, accordingly, assess whether OFAC considered "the relevant factors and whether there has been a clear error of judgment."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  "The scope of review under the 'arbitrary and capricious'

standard," however, "is narrow," and the Court must not "substitute its judgment for that of the agency." Id. Rather, the Court must "presume[] the validity of agency action," AT&T Corp. v. FCC, 349 F.3d 692, 698 (D.C. Cir. 2003), and uphold OFAC's action as long as it "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (cleaned up); see also State Farm, 463 U.S. at 43.

The D.C. Circuit, moreover, has urged courts to be particularly deferential to executive blocking orders, decisions "at the intersection of national security, foreign policy, and administrative law." Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007); see also Olivares v. TSA, 819 F.3d 454, 462 (D.C. Cir. 2016) ("[W]e defer to the informed judgment of agency officials whose obligation it is to assess risks to national security."); Zarmach Oil Servs. v. U.S. Dep't of the Treasury, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of deference to the political branches in matters of foreign policy, including cases involving blocking orders.") (cleaned up).

Having reviewed all the material upon which OFAC relied, and applying this highly deferential standard, the Court is satisfied that the agency's decision was not arbitrary or capricious. The classified record contains substantial evidence supporting the agency's conclusion that a sufficient basis exists for the designation, notwithstanding Plaintiff's contrary protestations. In addition, the agency compiled substantial unclassified evidence indicating that changed circumstances did not negate that basis. See Evidentiary Memorandum at 5–7.

Basengezi nonetheless takes aim at OFAC's decision in three ways. First, he argues that the agency "failed to explain why it discounted the arguments and evidence [that he] submitted." Pl. MSJ at 20. As he sees it, OFAC's evidentiary memorandum leaves "this Court [with] no way

to know whether [it] actually considered the materials [that he submitted] or — if it did so — why it nevertheless came to the conclusion that it did." Id. at 22.  By way of example, Plaintiff points to certain pieces of evidence that he submitted that the agency did not mention in its memorandum.  See, e.g., id. at 21 (citing "audit and mission reports from reputed international organizations and election monitors, which recommended the very action taken by the CENI[,] . . . even if such action caused delays to the scheduled elections"); id. at 22 (noting his "provision of the relevant procurement laws in the DRC and the authorizations received from various DRC governmental bodies for the [allegedly doubled election-related] contract award"); id. at 22–23 (citing "documentation showing how the contract award at issue was subject to scrutiny by multiple DRC government bodies and was consistent with international estimates, as shown by a Brennan Center report").

That argument does not persuade.  To start, although "an agency cannot ignore evidence that undercuts its judgment" or "minimize such evidence without adequate explanation," Genuine Parts Co. v. EPA, 890 F.3d 304, 312 (D.C. Cir. 2018), it need not "specifically cite and rebut every piece of evidence favorable to a [petitioner]" either.  Franks v. Salazar, 816 F. Supp. 2d 49, 65 (D.D.C. 2011).  It is true that OFAC did not explicitly articulate in the evidentiary memorandum why it rejected each point in Basengezi's 1,000-plus pages of exhibits.  But that does not render its decision arbitrary or capricious.  Plaintiff cites no authority requiring an agency to "specifically explain its view on each source of evidence in the record."  Ardmore Consulting Grp., Inc. v. Contreras-Sweet, 118 F. Supp. 3d 388, 396 (D.D.C. 2015).

Even though OFAC did not rebut each piece of evidence point by point, furthermore, it did consider the arguments raised in Basengezi's petition.  Not only did the agency say as much in its letter to his counsel, but it also summarized those arguments and structured its evidentiary

memorandum to rebut each one.  <u>See</u> Transmittal Letter at 1 (OFAC reached determination "after reviewing all of the unclassified and classified evidence in the record regarding [Basengezi]'s designation as an SDN, <u>including the materials [Basengezi] submitted</u>") (emphasis added); Evidentiary Memorandum at 4–5 (summarizing arguments); Evidentiary Memorandum at 5–11 (explaining argument by argument why delisting was inappropriate).  It also summarized and referenced Basengezi's questionnaire responses.  <u>See</u> Evidentiary Memorandum at 6–7.  There is, accordingly, no basis for thinking that it "disregard[ed] materials that were included in the administrative record."  ECF No. 15 (Pl. Reply) at 5 (quoting <u>Friends of Cap. Crescent Trail v. Fed. Transit Admin.</u>, 253 F. Supp. 3d 296, 302 (D.D.C.), <u>rev'd</u>, 877 F.3d 1051 (D.C. Cir. 2017)).

   To be sure, the agency "could have explained its reasons for rejecting [those] arguments in more detail."  <u>Galvin v. Del Toro</u>, 2023 WL 1795578, at *4 (D.D.C. Feb. 7, 2023) (quoting <u>Frizelle v. Slater</u>, 111 F.3d 172, 176 (D.C. Cir. 1997)).  But the question for the Court is not whether OFAC's evidentiary memorandum could have been more detailed — only whether it "minimally contain[ed] a rational connection between the facts found and the choice made."  <u>Id.</u> (quoting <u>Frizelle</u>, 111 F.3d at 176).  After all, "an agency's decision [need not] be a model of analytic precision to survive a challenge" under arbitrary-and-capricious review so long as its "path may reasonably be discerned."  <u>Dickson v. Sec'y of Def.</u>, 68 F.3d 1396, 1404 (D.C. Cir. 1995).  And the Court's *ex parte* review of the full administrative record here confirms that the agency has not run afoul of that requirement.  <u>See Olenga v. Gacki</u>, 507 F. Supp. 3d 260, 282 (D.D.C. 2020) (upholding OFAC decision, even though its "rationale for deciding that the incriminating evidence outweighs the exculpatory evidence [wa]s opaque," because the "record makes clear that the Office considered the competing facts"); <u>cf. Zevallos</u>, 793 F.3d at 114 ("[W]e agree that much of this evidence could be viewed in a light more beneficial to [the

plaintiff].  However, when we evaluate agency action, we do not ask whether record evidence could support the [plaintiff]'s view of the issue, but whether it supports the [agency's] ultimate decision.") (cleaned up).

Second, Basengezi contends that Defendants erred in rejecting his changed-circumstances argument.  Recall that OFAC provided two bases for such rejection: its finding that "the circumstances that led to his designation have not changed because he continues to exert influence over democratic processes or institutions in the DRC," and its finding that "he still meets the original past tense criteria for designation."  Transmittal Letter at 2.  To prevail on this challenge, then, he would have to establish that both were arbitrary and capricious.  See Pierce v. SEC, 786 F.3d 1027, 1034 (D.C. Cir. 2015) ("[A] reviewing court will uphold an agency action resting on several independent grounds if any of those grounds validly supports the result.").

Plaintiff, for his part, spills much ink inveighing against the first basis.  In particular, he insists that his ongoing activities — maintaining contact with CENI staff, doing advisory work with the Group of Experts for the Transition to a Digital Economy (GETEN), consulting on logistics and planning for private projects, and remaining engaged in unpaid advisory work for the DRC presidency — do not involve "illicit or sanctionable conduct" and were not "undertaken . . . with the aim of undermining democratic processes or institutions in the DRC." Pl. MSJ at 24–25.  As he sees it, OFAC erroneously relied on "the hypothetical risk that [he] may engage in sanctionable conduct in future."  Id. at 30.

Even if Basengezi were correct that OFAC erred in concluding that he continues to exert influence over democratic processes or institutions in the DRC, however, he fails to undercut the agency's second basis for rejecting his changed-circumstances argument: that he still meets the past-tense designation criteria.  As the Government points out, E.O. 13413 "expressly permits

designating persons based solely on past activity," and OFAC here concluded that Plaintiff

"continues to meet the original criterion for designation" based on his past activity.  See Def.

MSJ at 17 (quoting Evidentiary Memorandum at 7–8); see E.O. 13413, as amended, § 1(a)(ii)(C)

(allowing designation, inter alia, of individuals who "have engaged in, directly or indirectly . . .

actions or policies that undermine democratic processes or institutions in the Democratic

Republic of the Congo") (emphasis added); see also Olenga, 507 F. Supp. 3d at 281 (concluding

that one can be sanctioned under E.O. 13413 based on "an action they took in the past");

Karadzic v. Gacki, 602 F. Supp. 3d 103, 114 (D.D.C. 2022) (same under E.O. with analogous

language); Pejcic v. Gacki, 2021 WL 1209299, at *7 (D.D.C. Mar. 30, 2021) (same).

Plaintiff retorts that reading E.O. 13413 to "allow[] for designation based on prior

conduct . . . would defy OFAC's own delisting procedures, codified in its regulations, under

which persons who demonstrate a change with respect to those circumstances giving rise to the

initial designation merit delisting."  Pl. MSJ at 25 n.1.  That is simply not the case.  While he is

right that a designated individual "may" petition OFAC to be delisted by "assert[ing] that the

circumstances resulting in the designation no longer apply," 31 C.F.R. § 501.807, nothing in the

regulations compels OFAC to delist an individual who has ceased to engage in previous

sanctionable conduct.  See Karadzic, 602 F. Supp. 3d at 114; see also id. at 114–15 ("It is not

unreasonable that sanctions could maintain their usefulness even if the original reasons for

implementing them no longer apply.  The Court will not second guess the Executive's

permissible policy judgments in this area."); Olenga, 507 F. Supp. 3d at 281–82 ("[T]he

President has broad authority under IEEPA and could reasonably conclude that the deterrence of

international bad actors, at least at times, requires the imposition of sanctions on those who have

retired or moved on to other pursuits.  Such a determination is precisely the type of judgment that

is properly left to the President and his advisors and falls outside the judicial ken.").  The

agency's conclusion that Basengezi engaged in sanctionable conduct in the past is thus sufficient.

Third, Basengezi assails OFAC's decision by criticizing its reliance — which he

characterizes as "wholesale" — on the State Department's foreign-policy guidance

memorandum.  See Pl. MSJ at 25–28.  This critique, like his others, comes up wanting.  For one,

there is nothing suspect about OFAC's relying on State's memorandum.  The Government may

rely on "a range of materials" in making and justifying its designation decisions, including

"intelligence data," "hearsay declarations," "unverified open source materials like news media

reports," and even its own "press release[s]."  Rakhimov, 2020 WL 1911561, at *5 (cleaned up).

It most certainly may solicit and rely upon guidance from the State Department, as matters

affecting this country's foreign policy fall within its bailiwick.  Pejcic, 2021 WL 1209299, at *8

("By relying on the opinion of a subject-matter expert like the State Department, OFAC

marshaled sufficient support for its determination . . . .  It was reasonable for OFAC to accept the

findings of the State Department in denying [the plaintiff's] delisting petition, and that is

sufficient for this court to affirm OFAC's determination."); Karadzic, 602 F. Supp. 3d at 113

(OFAC "permissibly relied on . . . an assessment from the State Department").  In fact, even

Plaintiff concedes that "OFAC can consult with the State Department regarding a delisting matter

and can consider the State Department's foreign policy guidance when deciding on a delisting

request."  Pl. MSJ at 31–32.

For another, the agency's reliance on the State Department's guidance was not

"wholesale."  Contra Pl. MSJ at 24.  Indeed, the Court's ex parte review of the classified version

of the administrative record reveals that Defendants did not "substitute the State Department's

factual conclusions and findings for its own."  Pl. MSJ at 25–28, 32.  Rather, as OFAC explains,

such guidance "constituted only one piece of evidence relied upon by OFAC to deny Plaintiff's petition for reconsideration."  ECF No. 13 (Def. Reply) at 8 n.4; see also Olenga, 507 F. Supp. 3d at 282 (court "must defer to OFAC's resolution of which pieces of evidence were most credible and convincing").

At various points in his briefing, Plaintiff postulates that the problem with OFAC's reliance on the State Department's guidance is that State did not review his delisting petition before weighing in.  See Pl. MSJ at 24 ("OFAC does not . . . indicate whether the State Department played any role in reviewing Plaintiff's submissions to OFAC as part of the delisting matter when rendering such assessment."); id. at 25 ("There is no indication in the record . . . that the State Department provided such guidance or made such determinations following review of the materials submitted by Plaintiff during his delisting matter.").  The Government properly rejoins, however, that "neither the relevant regulations nor any other authority requires OFAC to engage in an inter-agency consultative and document-sharing procedure prior to denying a [delisting] petition."  Def. Reply at 10; see also 31 C.F.R. Pt. 547; 31 C.F.R. § 501.807.  The role of the State Department in the delisting process is not to adjudicate the merits of his delisting petition but merely to offer guidance for OFAC's consideration, as it did here.  See Def. Reply at 10–11.

In sum, Plaintiff has not provided a basis to disturb OFAC's decision to deny his petition.  The Court will therefore grant summary judgment to the Government on Count I.

B.  Notice Claims

That brings us to Basengezi's notice claims.  The Court begins with his Fifth Amendment challenge before turning to his more straightforward APA one.

1.  *Due Process (Count III)*

Plaintiff asserts that by providing deficient notice of the basis for denying his petition, OFAC violated his due-process rights under the Fifth Amendment.  The Government responds that it is unclear whether Basengezi, as a non-resident alien without any property in the United States, is even protected by that provision.  See Def. MSJ at 19.  Even if he is, OFAC says, summary judgment is warranted because he received all the process he was due.  Id. at 19–21.

a.  Entitlement to Invoke Fifth Amendment

As an initial matter, Defendants are correct that in order to prevail on a claim predicated on the Fifth Amendment (or any constitutional provision, for that matter), Basengezi would have to establish his entitlement to its protections.  "[N]on-resident aliens who have insufficient contacts with the United States are not [so] entitled[.]"  Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (citing Johnson v. Eisentrager, 339 U.S. 763, 771 (1950)); see also People's Mojahedin Org. of Iran v. U.S. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.").  By contrast, "where aliens have come within the territory of the United States and established 'substantial connections' with this country, . . . [they] may be accorded protections under the Constitution."  Jifry, 370 F.3d at 1182–83 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)).

The D.C. Circuit has considered this issue in several foreign-terrorist-organization-designation cases, but it has not articulated a specific test for determining when a foreign national residing outside the United States maintains the requisite "substantial connections."  Compare Nat'l Council of Resistance of Iran v. U.S. Dep't of State, 251 F.3d 192, 201–03 (D.C. Cir. 2001) (presence within National Press Building in United States and interest in small bank

account qualified as substantial connections), with 32 Cty. Sovereignty Comm. v. U.S. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002) (organization's members' rental of post-office boxes in United States and use of bank account to transmit funds and information to Ireland did not qualify).

In an analogous foreign-terrorist-organization-designation case, this Court held that "[d]escribing the legal consequences of any person's addition to the SDN list" — i.e., alleging that one's property and interests in property in the U.S. were blocked as a result of designation — "does not establish [a] [p]laintiff's substantial connections to the United States." Rakhimov, 2020 WL 1911561, at *5. That must be so or else "anyone challenging an OFAC designation would enjoy constitutional protections, regardless of the extent of her ties to this country." Id. see also Fares v. Smith, 901 F.3d 315, 318 (D.C. Cir. 2018) (describing designations under IEEPA as "analogous" to foreign-terrorist designations under Anti-Terrorism and Effective Death Penalty Act and narcotics-trafficker designations under Kingpin Act).

Plaintiff here, however, has done more than merely describe the legal consequences of his addition to the SDN List. His Amended Complaint alleges both that he was a "frequent traveler to the United States" prior to his OFAC designation and that he has two U.S.-citizen daughters who, as minors, are "wholly dependent on him for support, including necessities such as food, clothing, shelter, medical care, childcare, entertainment and enrichment activities, schooling, and gifts." Am. Compl., ¶¶ 50–51. Rather than presenting a full-throated argument that those connections are not substantial enough to trigger the protections of the Fifth Amendment, the Government posits somewhat noncommittally that "it is not clear that Plaintiff, a citizen of the DRC who resides in Kinshasa, and who does not have property in the United States, can assert rights under the Due Process Clause." Def. MSJ at 19. It then assumes

*arguendo* that Basengezi <u>can</u> invoke the Fifth Amendment — based on his children and past U.S. travel — and devotes its briefing to arguing that his due-process claim falls on the merits.

Because the Court ultimately agrees that even if the Due Process Clause applies, Basengezi received all the process he was owed, it will follow Defendants' lead and assume without deciding that he is entitled to invoke the Fifth Amendment.  <u>See</u> <u>Jifry</u>, 370 F.3d at 1183 (court need not decide whether plaintiffs "are entitled to constitutional protections" where, "even assuming that they are, they have received all the process that they are due under [D.C. Circuit] precedent"); <u>Olenga</u>, 507 F. Supp. 3d at 274 (opting to "assess[] whether [plaintiff] received all the process due under the Fifth Amendment, while assuming that the due process clause applies," since "[t]hat approach is more straightforward because, in the context of designations under IEEPA and related statutes, the standards for determining whether an agency has afforded due process are far more developed than those for assessing whether constitutional protections apply"); <u>Joumaa v. Mnuchin</u>, 798 F. App'x 667, 669 (D.C. Cir. 2020) (similar); <u>cf.</u> <u>Al-Hela v. Biden</u>, 66 F.4th 217, 224–28 (D.C. Cir. 2023) (*en banc*) (assuming without deciding that Fifth Amendment applies where it was not violated and suggesting that "is the correct and most prudent course of action").

### b.  Sufficiency of Process Afforded

With that, the Court turns to the question of whether OFAC provided sufficient process. Contending that it did not, Basengezi argues that its disclosures — the Federal Register notice and press release announcing his initial designation, the redacted administrative record underlying that designation, and the redacted administrative record underlying OFAC's denial of his delisting petition — "taken in aggregate" neglected to "provide [him] with sufficient notice as to the reasons for the denial decision."  Pl. MSJ at 34.  In particular, he points to how much of

the evidentiary memorandum was redacted: three of the five paragraphs supporting OFAC's finding that "there is sufficient reason to believe that [he] misappropriated CENI funds and state assets that led to election delays," two of the three paragraphs showing that "there is sufficient reason to believe that [he] . . . award[ed] [an] election-related contract and doubled the contract award for his personal profit," and three of the four paragraphs suggesting that "there is sufficient reason to believe that [he] enriched himself through the purchase and sale of gasoline for profit." Id. at 35–37 (quoting Evidentiary Memorandum at 8, 9, 10).

In assessing whether OFAC has provided a designee with constitutionally adequate notice, thus "enabling him meaningfully to avail himself of his opportunity to be heard," courts weigh three factors under the familiar balancing test set out in Mathews v. Eldridge, 424 U.S. 319, 335 (1976): (1) "the private interest . . . affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and  (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Fares, 901 F.3d at 323 (quoting Mathews, 424 U.S. at 335).

As to the first factor, the D.C. Circuit has explained that "[a]s a general matter, the effect of an OFAC designation on the designee's private interests is 'dire.'" Id. at 323 (quoting Nat'l Council of Resistance, 251 F.3d at 196).  Indeed, "[b]y design, a designation by OFAC completely shutters all domestic operations" of a designee.  Id. (cleaned up).  Plaintiff here alleges that "[b]y virtue of []his designation, [he] has been made the subject of an international boycott whereby persons all over the world — including in his home country of the DRC — are subject to sanctions . . . for engaging in any transactions or dealings with him."  Am. Compl.,

¶ 49.  This, he represents, "has substantially undermined not just [his] family ties, but also his ability to support his children's upbringing." Id., ¶ 51.

With respect to the second, the Circuit has similarly acknowledged that "[w]hen the government freezes assets based on redacted evidence — thereby limiting the designee's opportunity to probe or cross-examine on that evidence — the risk of erroneous deprivation is especially high." Fares, 901 F.3d at 323–24; cf. Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, 686 F.3d 965, 980 (9th Cir. 2012) (second Mathews factor supports argument that use of classified information violates designee's procedural due-process rights).

That said, our Circuit has decisively "rejected the argument that a designation violates due process simply because the agency relies upon . . . classified information that the government refused to disclose." Fares, 901 F.3d at 324 (cleaned up).  For one, the Court's *ex parte* and *in camera* review of such information mitigates the risk of erroneous deprivation. Olenga, 507 F. Supp. 3d at 277 ("[W]here an OFAC determination is supported by classified information, the D.C. Circuit has 'authorized' use of an alternative process of judicial review that provides the designee with notice and an opportunity to be heard but permits OFAC to submit the classified material to the court *ex parte* and *in camera*.").  For another, the third factor — "the governmental interest at stake" — is dispositive "in extraordinary circumstances[] where the government's withholding is justified by the privilege and prerogative of the executive in protecting vital national security interests." Fares, 901 F.3d at 324 (cleaned up).  In such cases, the Court of Appeals has "countenanced the use of undisclosed classified evidence to form the basis of a designation and freeze an individual's assets" because "[f]orcing the executive branch to disclose information that it has validly classified would 'compel a breach in the security which that branch is charged to protect.'" Id. (quoting Nat'l Council of Resistance, 251 F.3d at 208–

09); see also Holy Land, 333 F.3d at 163–64 (rejecting due-process challenge to OFAC designation based on withheld classified information and emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information, and the Executive's compelling interest in withholding national security information from unauthorized persons in the course of executive business") (cleaned up).

Here, Basengezi does not challenge OFAC's treatment of the redacted information as classified and privileged — and the Court's review of the *ex parte* submission confirms that he would have no basis to do so. Cf. Olenga, 507 F. Supp. 3d at 277. Nor does he argue that the agency's reliance on classified information *per se* violated his due-process rights — an argument that would, in any event, be foreclosed by the binding precedent described above. Instead, his argument hinges on the claim that the unclassified disclosures he received failed to provide him with a "basis from which to understand his [continued] designation and . . . offer rebuttal arguments and evidence." Pl. MSJ at 33 (quoting Zevallos, 10 F. Supp. 3d at 117).

That claim misses the mark. No doubt, OFAC would have made things easier for him if it had provided unclassified summaries of the classified portions of the administrative record, as it has done in many cases before courts in this district. See, e.g., Olenga, 507 F. Supp. 3d at 277 (noting agency's provision of unclassified summaries that were "relatively detailed, providing dates and locations for many of the allegations"); Fares v. Smith, 249 F. Supp. 3d 115, 124 (D.D.C. 2017), aff'd, 901 F.3d 315 (D.C. Cir. 2018) (same). But the Circuit has never held that such summaries are required by the Fifth Amendment, see Fares, 901 F.3d at 324; see also Bazzi v. Gacki, 468 F. Supp. 3d 70, 79 (D.D.C. 2020) (adequate notice even without unclassified summaries), and the "total body of information provided by OFAC" here adequately informed Basengezi of the basis of his continued designation. Fares, 249 F. Supp. 3d at 125–28.

For instance, the Evidentiary Memorandum explained the factual bases for concluding that he had not demonstrated a change in circumstances: he "remains connected to CENI" through "informal contacts [with] CENI staff, including alleged efforts to influence CENI hiring decisions"; he "is still independently consulting on logistics and planning for private projects and remains engaged in limited unpaid advisory work for the current DRC presidency . . . under contract with former and current DRC government officials"; he "had worked as an unpaid advisor for the current DRC Presidency through [GETEN]," including having "traveled to Japan to attend meetings as part of a delegation sent by the DRC Presidency"; and "under [his] leadership, elections scheduled for December 2016 were postponed to 2018."  Evidentiary Memorandum at 5–7.  It also outlined the allegations underlying his initial designation, which he failed to negate: his embezzlement of CENI funds and election delays, inflation of an election-related contract for profit, and strategic positioning of gasoline sales to delay election registration and turnout.  Id. at 8–11.  Additionally, the agency sent Basengezi two questionnaires about his relationship to the DRC government, see 1st Questionnaire; 2nd Questionnaire, which "gave him additional notice of what information OFAC considered important in reconsidering [his] initial designation."  Olenga, 507 F. Supp. 3d at 278; see also Rakhimov, 2020 WL 1911561, at *7 ("OFAC's questionnaires offer further information; indeed [the plaintiff's] submissions acknowledge that they provide meaningful details regarding the evidence against him.").  And it supplied him with an administrative record that included unclassified information — e.g., the exhibits supporting the initial designation, such as news articles — shoring up its conclusions.

Thanks to all of that, Basengezi knew the "'who,' 'what,' 'when' and 'where' of the allegations" underlying his continued designation.  Fares, 901 F.3d at 324 (quoting Kiareldeen v, Ashcroft, 273 F.3d 542, 548 (3d Cir. 2001)); see also Bazzi, 468 F. Supp. 3d at 79–80.  He was

by no means left "stumbling toward a moving target" nor wholly left in the dark as to any of OFAC's justifications.  <u>Fares</u>, 901 F.3d at 322 ("Designees can contest that agency disclosure of some but not all of the allegations against them impairs their ability to fully clear their names for delisting, leaving them stumbling towards a moving target.") (cleaned up); <u>see also</u> <u>Al Haramain</u>, 686 F.3d at 986 (although OFAC's press release gave "some clarity" on the allegations against plaintiffs, it did not satisfy due process because it informed them of only one of three reasons for its designation).  Even if he is "frustrated by not being able to discredit the specific evidence against him," moreover, he is not "without means to submit his own evidence countering these allegations" in another delisting petition.  <u>Bazzi</u>, 468 F. Supp. 3d at 80; <u>see also</u> <u>Zevallos</u>, 793 F.3d at 110 (no limit on delisting attempts).

In sum, the Court acknowledges that Plaintiff is "at somewhat of a disadvantage in being unable to review the whole administrative record, in particular the classified record."  <u>Kadi v. Geithner</u>, 42 F. Supp. 3d 1, 23 (D.D.C. 2012).  Given the amount of information that OFAC provided here and "the overriding governmental interest at stake in protecting classified information and the wide berth afforded the executive branch in matters relating to foreign affairs and national security," however, the Court finds that Basengezi has received sufficient notice to comply with the Fifth Amendment.  <u>See</u> <u>Olenga</u>, 507 F. Supp. 3d at 278.  Summary judgment will, accordingly, also be entered on this count for Defendants.

### 2.  *APA (Count II)*

Basengezi finally repackages his due-process notice claim as an APA challenge, alleging that OFAC violated that statute by neglecting to provide him with sufficient notice of the basis for its decision to deny his delisting petition.  His submissions, however, provide very little in the

way of support for this challenge; neither of the two arguments that the Court divines from the relatively thin briefing can carry the day.

First, Plaintiff invokes the APA's requirement that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D); see Am. Compl., ¶ 64. Insofar as this argument substantively challenges OFAC's decision as unreasonable, see Pl. MSJ at 42–43 (citing arbitrary-and-capricious cases); Pl. Reply at 18 (same), it is not a notice claim at all, but rather merely a facsimile of Count I. To the extent that Basengezi is instead arguing that OFAC did not follow "procedure required by law," he declines to so much as mention what procedure he thinks was violated. To the extent he thinks that a declassified summary was that procedure, the Court just concluded that such procedure is not required by law.

Second, Basengezi tries to substantiate this count by citing the APA's notice requirement, codified at 5 U.S.C. § 555(e), which requires an agency to provide "a brief statement of the grounds for denial" whenever it "den[ies] in whole or in part . . . a written application, petition or other request of an interested person made in connection with any agency proceeding." Roelofs v. Sec'y of the Air Force, 628 F.2d 594, 600 (D.C. Cir. 1980); see Pl. MSJ at 43. But that "notice requirement is not onerous," and OFAC's disclosures provided Basengezi with "much more than the 'brief statement' of [the] grounds [for denial]" that § 555(e) requires. Sulemane, 2019 WL 77428, at *7 (reaching same conclusion under § 555(e) where OFAC provided transmittal letter and evidentiary memoranda, "[e]ven though portions of those memoranda remained redacted," and noting that "APA provides no basis for [a plaintiff] to demand [classified and privileged information]"); see also Butte County v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010) ("brief statement" requirement of § 555(e) is "minimal"). The Government,

accordingly, did not even come close to tripping on the low bar of 5 U.S.C. § 555(e).  This count

will, therefore, meet the same fate as those before it: summary judgment in favor of Defendants.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary

Judgment and deny Plaintiff's Motion.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  March 11, 2024